**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Alfred J. Lizotte, | ) | |
| | ) | **ORDER DENYING DEFENDANTS'** |
| Plaintiff, | ) | **MOTION FOR PARTIAL SUMMARY** |
| | ) | **JUDGMENT** |
| vs. | ) | |
| | ) | |
| Dacotah Bank, a South Dakota Banking | ) | |
| Corporation, Gaylen W. Melgaard, | ) | |
| Bobby Compton, and Joe Senger, | ) | Case No. 4:08-cv-084 |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' motion for partial summary judgment filed on October 20, 2009.  See Docket No. 12.  The Plaintiff filed a response in opposition to the motion on November 19, 2009. See Docket No. 17.  On November 24, 2009, the Defendants filed a reply brief. See Docket No. 19.  The Court denies the motion for the reasons set forth below.

I.     **BACKGROUND**

In March 2003, the plaintiff, Alfred J. Lizotte, was hired as a mortgage loan officer by Defendant Dacotah Bank to work in the Minot, North Dakota branch.  Lizotte was later promoted to assistant vice president of commercial lending.  At the time of the alleged wrongdoing, Defendant Gaylen W. Melgaard was the market president for Dacotah Bank in Minot, North Dakota; Defendant Bobby Compton was the human resources director of Dacotah Banks, Inc., the parent holding company of Dacotah Bank; and Defendant Joe Senger was the senior vice president of Dacotah Bank.

On May 5, 2004, Lizotte signed an employee acknowledgment form in which Lizotte agreed that either he or Dacotah Bank could terminate employment "at will, with or without cause, at any

time, so long as there is no violation of applicable federal or state law." <u>See</u> Docket No. 16-2.  The

agreement also stated that it was "neither a contract for employment nor a legal document." <u>See</u>

Docket No. 16-2.

On Thursday, November 30, 2006, Lizotte consumed approximately ten to twelve drinks at

a Minot, North Dakota bar.  On his way home, "and for whatever reason had the thought I have had

enough of this shit" and drove to a cemetery in Minot.  <u>See</u> Docket No. 16-6, p. 48.  Lizotte took a

gun out of his backseat and was standing in the cemetery when his sister arrived.  In his deposition,

Lizotte stated,

> She approached me, asked me to give her the gun[, saying] A.J., this is stupid, don't
> do this.  I told her I'd had enough, I don't want to be here anymore.  She proceeded
> to grab the gun and take it away from me, and I told her to -- I said, let go unless you
> want to go first.  You better let go.  I was pissed.  I was serious.  And she let go and
> got on the phone and went over to the -- probably 30, 40 yards away from me and
> was on the phone with the police.

<u>See</u> Docket No. 16-6, p. 49.  Lizotte then got into his sister's vehicle and drove away.  Several police

cars ended up following Lizotte to his mother's home in Minot, where he was taken into custody.

Lizotte was involuntarily committed to the psychiatric inpatient unit for a period of four days

following the incident.

On December 1, 2006, Lizotte called his immediate supervisor at Dacotah Bank, Doug

Freeman, and told him that he was unable to come into work that morning.  The following day,

Compton spoke with Lizotte on the phone.  On December 5, 2006, Lizotte's physician, Dr. Shamim

Anwar, filled out a "Certification of Health Care Provider" which was provided by Dacotah Bank,

and faxed it to Dacotah Bank in Minot.  The certification stated that Lizotte could return to full work

duties on December 11, 2006.  <u>See</u> Docket No. 1-1.  On December 8, 2006, Compton sent Lizotte

a letter, stating, "Because of the impact of your action in the community and on the ability to

2

perform your job, we are placing you on a Leave of Absence to allow us time to review the information and consider that issue."  <u>See</u> Docket No. 1-2.

On December 14, 2006, Lizotte met with Compton, Melgaard, and Senger at Dacotah Bank in Minot.  Lizotte was given a document to sign that indicated it was his last day of employment and, "In exchange for your agreement to the terms of this letter, we will offer you a special severance package of six thousand five hundred dollars ($6,500.00) . . ."  <u>See</u> Docket No. 1-3.  According to the complaint, Lizotte unwillingly signed the document.  <u>See</u> Docket No. 1.  On December 15, 2006, Dacotah Bank sent Lizotte a "Notification of Employee" resignation form which Lizotte did not sign.  <u>See</u> Docket No. 1-4.

On April 9, 2007, Lizotte filed a charge of discrimination with the North Dakota Department of Labor, alleging Dacotah Bank violated the North Dakota Human Rights Act and Title I of the Americans with Disabilities Act of 1990.  On January 3, 2008, the Department of Labor issued a determination that the Department "reasonably believes a violation of applicable statutes has occurred."  <u>See</u> Docket No. 16-5.  The Department of Labor concluded:

> Evaluation of the evidence DOES support [Lizotte's] allegations of discrimination because of his disability.  The evidence indicates that [Lizotte] was regarded as a person with a disability and was terminated from employment for reasons relating to his perceived disability in violation of Title I of the Americans with Disabilities Act of 1990, as amended, and the North Dakota Human Rights Act.

<u>See</u> Docket No. 16-5.

On May 27, 2008, Lizotte commenced an action in state district court.  Lizotte filed a complaint in federal district court on September 29, 2008.  <u>See</u> Docket No. 1.  On June 19, 2009, the state court issued an order to stay the state court proceedings until the disposition of the federal court action.  <u>See</u> Docket No. 15-1.

The complaint alleges nine different claims: 1) disability discrimination under the Americans with Disabilities Act (ADA), 2) disability discrimination under the North Dakota Human Rights Act, 3) mental and emotional distress, 4) breach of contract, 5) tortious interference with prospective business relations, 6) violation of public policy, 7) false imprisonment, 8) defamation, and 9) the doctrine of respondeat superior. Lizotte does not allege that he had an actual limiting impairment at the time he was terminated. Instead, Lizotte contends he suffered discrimination because he was "regarded as" being disabled. The Defendants move for partial summary judgment, contending that Count I of the complaint (disability discrimination under the ADA) should be dismissed with prejudice as a matter of law, and the remaining counts of the complaint are state court claims with no independent basis for federal court jurisdiction that should be dismissed without prejudice.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party

4

first has the burden of demonstrating an absence of genuine issues of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

"Motions for summary judgment in employment discrimination cases are scrutinized more carefully because of the inherently factual nature of the inquiry and the factual standards set forth by Congress."  Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005).  As such, "'summary judgment should seldom be used in employment-discrimination cases.'"  Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997) (quoting Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994)).  "Nonetheless, 'summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case.'"  Simpson, 425 F.3d at 542 (quoting EEOC v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001)).


## III.     LEGAL DISCUSSION

The complaint alleges disability discrimination under the ADA and eight different state law claims.  The Defendants contend that the claim of disability discrimination under the ADA should be dismissed as a matter of law because Lizotte did not have a "disability" as defined by the ADA, and Lizotte has failed to present evidence of a genuine issue of material fact as to whether the Defendants regarded him as disabled.

The Americans with Disability Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., "seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently

increased productivity." <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 801 (1999) (citing 42 U.S.C. §§ 12101(a)(8), (9)).  The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability" regarding job application procedures, hiring, advancement, discharge of employees, employee compensation, job training, and other terms and conditions of employment.  42 U.S.C. § 12112(a).

Disability discrimination claims are evaluated under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Simpson</u>, 425 F.3d at 542 (citing <u>Kratzer v. Rockwell Collins, Inc.</u>, 398 F.3d 1040, 1044 (8th Cir. 2005)).  Under this framework, the plaintiff first has the burden to establish a prima facie case of discrimination.  Once the plaintiff makes a prima facie case, the defendant has the burden to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant does so, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination.

### A.    ADA – PRIMA FACIE CASE

In order for an employee to make out a prima facie case under the ADA, he must show: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.  <u>Henderson</u>, 403 F.3d at 1034.

## 1.   **DISABLED UNDER THE ADA**

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1) (emphasis added).  Lizotte contends he meets the definition of disability because he was "regarded as" having an impairment that substantially limits one or more of his major life activities.  "An employer regards an employee as disabled if it 'mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or [it] mistakenly believes that an *actual* impairment substantially limits one or more major life activity.'"  Christensen v. Titan Distribution, Inc., 481 F.3d 1085, 1093 (8th Cir. 2007) (emphasis in original) (quoting Chalfant v. Titan Distribution, Inc., 475 F.3d 982, 988-89 (8th Cir. 2007)); see 42 U.S.C. § 12102(3)(A). .

"Major life activities" are defined by the ADA as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and *working*." 42 U.S.C. § 12102(2)(A) (emphasis added).  A major life activity also includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

> "An impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population." Fjellstad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948-49 (8th Cir. 1999).  To determine whether an individual is substantially limited in a major life activity, the Court must consider "(1) the nature and severity of the

impairment; (2) its duration or anticipated duration; and (3) its long-term impact."
Id. at 949 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

Burke v. N.D. Dep't of Corr. & Rehab., 620 F. Supp. 2d 1035, 1061-62 (D.N.D. 2009).  Lizotte contends that the Defendants mistakenly believed that his mental disorder substantially limited his major life activity of working.

To be regarded as substantially limited in the major life activity of working so as to be disabled under the ADA, one must be regarded as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  The analysis under this definition focuses not on the plaintiff and his actual abilities but instead on the reactions and perceptions of those he works and interacts with.  See Kelly v. Drexel Univ., 94 F.3d 102, 109 (3rd Cir. 1996).  Thus, in order to establish that the Defendants regarded Lizotte as substantially limited in the major life activity of working, Lizotte must show that the Defendants regarded him as being precluded from performing more than one type of job, a specialized job, or a particular job of choice. Sutton v. United Air Lines, 527 U.S. 471, 492 (1999).  The ADA does not go so far as to require that the employer mistakenly believes the employee is unable to perform *all* jobs.  Rather, an individual is disabled if his impairment merely prevents performance of a certain class of jobs.  Webb v. Garelick Mfg. Co., 94 F.3d 484, 487 (8th Cir. 1996).

The Equal Employment Opportunity Commission (EEOC) has issued regulations and interpretive guidelines which specify the types of "regarded as" discrimination in violation of the ADA:

(l) Is regarded as having such an impairment means:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).  See Burke, 620 F. Supp. 2d at 1063-64.

Lizotte contends that the Defendants' actions in connection with his termination reflect conduct that falls within the definitions set forth above.  The record reveals that Lizotte's treating psychiatrist, Dr. Anwar, had diagnosed him with a mental disorder - mood disorder, not otherwise specified.  See Docket No. 16-7, p. 19.  Lizotte argues that this mental disorder did not substantially limit his major life activities "but Dacotah Bank 'treated [it] as constituting such limitation.'"  See Docket No. 17.  In addition, or in the alternative, Lizotte contends that he had no mental impairment but was treated by Dacotah Bank as having a substantially limiting impairment.

In the Appendix to Part 1630, the EEOC has elaborated on the background of the "regarded as" language in the statute:

> The rationale for the "regarded as" part of the definition of disability was articulated by the Supreme Court in the context of the Rehabilitation Act of 1973 in School Board of Nassau County v. Arline, 480 U.S. 273 (1987).  The Court noted that, although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling.  "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment."  480 U.S. at 283.  The Court concluded that by including "regarded as" in the Rehabilitation Act's definition, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."  480 U.S. at 284.

> An individual rejected from a job because of the "myths, fears and stereotypes" associated with disabilities would be covered under this part of the definition of disability, whether or not the employer's or other covered entity's perception were shared by others in the field and whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of this definition. As the legislative history notes, sociologists have identified common attitudinal barriers that frequently result in employers excluding individuals with disabilities. These include concerns regarding productivity, safety, insurance, liability, attendance, cost of accommodation and accessibility, workers' compensation costs, and acceptance by coworkers and customers.
>
> Therefore, if an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on "myth, fear or stereotype," the individual will satisfy the "regarded as" part of the definition of disability. If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of "myth, fear or stereotype" can be drawn.

29 C.F.R. pt. 1630 app.

The definition of "regarded as" disabled or impaired assumes the individual is not actually disabled for ADA purposes. Christensen, 481 F.3d at 1091 n.2 (citing Wenzel v. Mo.-Am. Water Co., 404 F.3d 1038, 1041 (8th Cir. 2005)). "Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent." Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001); see also Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998) ("whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability'" (internal quotations omitted)). It is important to note that the employer's motive or intent is "rarely susceptible to resolution at the summary judgment stage." Ross, 237 F.3d at 706.

Lizotte claims the Defendants terminated him because they regarded his mental condition or impairment as substantially limiting him from the major life activity of working. A review of the record reveals evidence that the Defendants were aware of Lizotte's mental impairment before his

termination.  Gaylen Melgaard testified that he knew Lizotte was seeking treatment for depression and was given medication to address that condition prior to November 2006.  See Docket No. 16-10, pp. 19-20.  Lisa Jundt, a mortgage lender at Dacotah Bank at the time of the incident, testified in her deposition that employees, including Melgaard, knew Lizotte was seeking counseling.  See Docket No. 18-1, pp. 33-34.  Bobby Compton testified that Melgaard told him (Compton) that Lizotte had been seeking treatment from a mental health professional in the months before the termination.  See Docket No. 16-8, pp. 157-58.  Joe Senger also answered in the affirmative when asked if he knew that Lizotte was having "some kind of issues with his head" several months before the incident.  See Docket No. 16-11, p. 54.  The record reveals that all of the Defendants knew Lizotte had attempted suicide the night of November 30, 2006 and was thereafter hospitalized for several days.  Lizotte testified that at the December 14, 2006 meeting, before being terminated, he informed the Defendants about the medications he was on and about his symptoms.  See Docket No. 16-6, pp. 60-61.  Melgaard agreed that Lizotte expressed concern about his mental health at the December 14, 2006 meeting.  See Docket No. 16-10, pp. 51-52.

The record reveals that Gaylen Melgaard said he was "blown away" that Lizotte was released from the psychiatric unit after only four days "because of this critical event," was ready to go back to work, and was not in jail.  See Docket No. 16-10, pp. 36-37.  None of the Defendants contacted Lizotte's treating physician besides having Dr. Anwar fill out the "Certification of Health Care Provider."  See Docket No. 16-7, p. 52.  A jury could reasonably find that the Defendants perceived Lizotte's mental impairment to be much more restricting than Dr. Anwar described, and so restricting that the Defendants felt he could not work at the bank.  If an individual can show that an adverse employment decision was made by the employer because of a perception of a mental

11

impairment - whether based on myth, fear, or stereotype - the "regarded as" prong of being defined as disabled under the ADA is generally satisfied.  See 29 C.F.R. § 1630.2(l).  A reasonable fact finder could find that Lizotte was "regarded as" disabled or impaired under the ADA.  The Court finds that genuine issues of material fact exist as to whether the Defendants regarded Lizotte as having a mental impairment.

The Court has carefully reviewed the depositions on file.  Gaylen Melgaard, Joe Senger, Bobby Compton, Dick Westra, and Rod Fouberg of Dacotah Bank all testified about their general concerns regarding potential damage to the bank's business or reputation in the community.  Lizotte argues that the Defendants' testimony affirms the fact that they were acting not on the basis of hard evidence or reasonable business judgment, but out of fear and based on myths, stereotypes, and archaic attitudes toward mental illness.  The record reveals that the November 30, 2006 incident was not well known in the community of Minot or even among the Dacotah Bank employees, and no adverse business results occurred in the two weeks between November 30, 2006 and Lizotte's termination on December 14, 2006.  No customers pulled their accounts from the bank nor asked to be transferred to a different loan officer.

Lizotte contends that "the most damning evidence of discrimination" came from Melgaard in his interviews with the North Dakota Department of Labor.  In an interview taken by the Department of Labor prior to the January 3, 2008 determination, Melgaard stated,

> It kind of blew me away that, um – this is serious enough of a matter.  Uh, a person is pulling – or threatening to kill themselves, that they would have – that there's some other, um, (indiscernible) treatment that this person would have.  It blew me away that he was released and, uh – and nothing else said . . . – you apparently got something going on if you're gonna go kill yourself.  I've never heard of you being released four days after threatening to kill yourself.

<u>See</u> Docket No. 18-4, pp. 9-10.  In Melgaard's March 10, 2009 deposition, he said, ". . . – you can see in my testimony before that when I heard that he was released after three, four days after the critical event that happened on the hill, I was blown away.  I was blown away that because of this critical event that you're ready to go back to work, that you're not in jail."  <u>See</u> Docket No. 16-10, pp. 36-37.  Lizotte argues that Melgaard was not satisfied by Dr. Anwar's certification that Lizotte could return to work full-time, and that Melgaard "could not get it out of his head that Lizotte was being released so soon, without 'some other type of treatment because of the seriousness of the matter.'"  <u>See</u> Docket No. 17.  Lizotte further argues that the Defendants were not interested in the details of Lizotte's mental condition, either before or during the December 14, 2006 termination meeting.

In <u>Ross v. Campbell Soup Co.</u>, 237 F.3d 701 (6th Cir. 2001), Ross was an employee who worked as a sales merchandiser with minimal physical requirements.  He sustained a series of back injuries.  One of his supervisors commented "[w]e can't have any more of this back thing."  A memo was circulated through company management which stated, "Maureen - When can we bring this problem person to a termination status.  P.S. - Back Case."  <u>Id.</u> at 704.  Ross was given a negative annual performance review and his performance goals were increased substantially.  Ross was terminated from his employment and later filed an ADA action.  The district court granted summary judgment to Campbell Soup, finding insufficient evidence that Ross was disabled at the time of his discharge, had a record of disability, or was "regarded as" disabled.  <u>Id.</u> at 705.  The Sixth Circuit Court of Appeals reversed and found that Ross had presented sufficient evidence to create a genuine issue of material fact concerning whether the company regarded him as a person with a disability.

Id. at 710.  The appellate court focused on the "back memo" which referred to Ross as a "problem person" and a "back case" and stated as follows:

> The ADA was enacted, in part, to eliminate the sort of stereotyping that allowed employers to see their employees primarily as their disabilities and not as persons differently[ ]abled from themselves.  That the note's author would think to identify Ross with the scrawled post-script "back case" demonstrates that there is at least a genuine issue of material fact that Campbell Soup Co. regarded Ross through the lens of his medical condition.  It is precisely this sort of limited vision that the ADA seeks to eliminate.

Id. at 707.  Lizotte contends that the upper management of Dacotah Bank similarly regarded him through the lens of a medical condition that they did not understand and of which they were afraid.

Lizotte also cites to Doukas v. Metropolitan Life Ins. Co., in which the plaintiff applied for mortgage disability insurance and in her application revealed that she had been diagnosed with bipolar disorder and had been taking lithium for eight years.  1997 WL 833134, *1 (D.N.H. 1997) (unpublished).  MetLife denied the application, admitting it did so based on its perception that Doukas' bipolar disorder created a risk that she would be unable to work.  The court held there was an issue of fact as to whether MetLife regarded Doukas as disabled within the meaning of the ADA.

Another case Lizotte cites to is Stradley v. Lafourche Communications, Inc., 869 F. Supp. 442 (E.D. La. 1994), in which the court denied the defendant's motion for summary judgment on a "regarded as" claim under the ADA.  The plaintiff's supervisor, LeBouf, was unaware that Stradley had been diagnosed with an "Adjustment Disorder with Mixed Emotional Features," but did regard him as suffering from depression.  The court stated as follows:

> Depression and other mental illnesses can qualify as disabilities for purposes of the ADA.  See Doe v. Region 13 Mental Health-Mental Retardation Commission, 704 F.2d 1402 (5th Cir. 1983); 42 U.S.C. § 12102(2)(A) (defining disability as a "physical or mental impairment").  Thus, if LeBeouf regarded plaintiff as suffering from depression or another mental illness that he believed substantially limited a major life activity, plaintiff had a disability under the ADA.  See Partlow v. Runyon,

14

826 F. Supp. 40, 45 (D.N.H. 1993) ("the proper test is whether the impairment, *as perceived*, would affect the individual's ability to find work across the spectrum of same or similar jobs"). The record clearly presents a question of fact on this issue. LeBeouf testified to his understanding that plaintiff was suffering from "acute anxiety and depression." LeBeouf Deposition at 19, 25. He accepted this diagnosis, interpreted it in layman's terms, and did not question Stradley's doctors about its systems or effects. Id. at 19, 22-23. Based on his "general life experiences," he believed that Stradley's condition made him potentially violent and hostile in the workplace. Id. at 41-42. A reasonable jury could interpret this belief as a conclusion that Stradley was not fit to work in any job. Thus a genuine issue of fact exists as to whether LeBeouf regarded Stradley as having a disability for the purposes of the ADA.

Stradley, 869 F. Supp. at 443-44.

The record reveals that Gaylen Melgaard was aware of Lizotte's depression and had communicated with his superiors concerning the fact Lizotte was receiving treatment for this condition. See Docket No. 16-10, pp. 16-17. For months prior to November 30, 2006, Melgaard knew that Lizotte was taking anti-depressant and/or anti-anxiety medication. A jury could reasonably conclude that the Dacotah Bank officials' response to Lizotte's threat of suicide was arguably based on a view of Lizotte's depression in "layman's terms," i.e., that Lizotte was suffering from a condition which made him potentially violent and hostile in the workplace. If the upper management of Dacotah Bank "regarded" Lizotte as suffering from depression, or some other form of mental illness, that they believed substantially limited a major life activity (Lizotte's ability to work at the bank), then Lizotte has created a genuine issue of material fact concerning whether he is considered to be disabled under the ADA. See C.F.R. § 1630.2(l).

Lizotte also cites to McKenzie v. Dovala, 242 F.3d 967 (10th Cir. 2001), in which the plaintiff, a deputy sheriff with a history of psychiatric illness, had an episode in which she went to her father's grave and fired six rounds from her revolver. McKenzie was employed for ten years by the Natrona County Sheriff's Office in Casper, Wyoming. Id. at 968. After suffering a series of

15

psychological afflictions, including post-traumatic stress disorder related to childhood sexual abuse by her father, McKenzie voluntarily resigned in October 1996 to seek psychological care.  In late November 1996, after a course of medication and therapy, she was released to return to work by her supervising physician.  McKenzie sought re-employment at the Sheriff's Office, but notwithstanding her ten years of law enforcement experience and fine record as a patrol officer, she was rejected at all agencies to which she applied in Wyoming and Nevada.  In October 1997, McKenzie went to her former employer, Sheriff Dovala in Natrona County, and asked to be considered for any job in the department.  Dovala told McKenzie he was reluctant to hire her because of "liability" concerns and fear of public uneasiness related to her past illness.  He also admitted that he had passed over her application for a patrol officer position even though positions had become available between November 1996 and October 1997.

McKenzie filed suit under the ADA claiming she was not rehired in Natrona County either due to her record of disability or because Sheriff Dovala regarded her as disabled.  Id. at 969.  The 10th Circuit Court of Appeals reversed the district court's order granting summary judgment and held that "[t]he district court had before it abundant evidence supporting McKenzie's claim that she was regarded as disabled."  Id. at 970.  The appellate court pointed to Sheriff Dovala's testimony that he was concerned that McKenzie's past psychiatric history would be brought up if she had to testify in court, and that he and his staff had concluded McKenzie "would be better off in some other field."  Id. at 970-71.  Mark Benton, an undersheriff, testified that at the time of McKenzie's 1997 application he was concerned that her fellow officers and the public would not "trust" her and that "it was [not] in her best interest or the best interest of the office for her to regain her position in law

enforcement." Id. at 971.  Notwithstanding the release to return to work from McKenzie's treating physician, Benton testified he "didn't care for the concept" of her return.  Id.

The Court has reviewed all of the cases cited by the parties in their briefs.  It is clear that "regarded as" claims under the ADA are often not appropriate for summary judgment.  The jury should be allowed to weigh the credibility of the witnesses, examine the defendant's rationale for the termination of the plaintiff, and sift through circumstantial evidence.  There is undisputed evidence that Lizotte was terminated on December 14, 2006 because of the Defendants' concerns about "safety," "reputation," "customer acceptance," "liability," and a desire to protect the bank's image in Minot.  The EEOC regulations and case law explicitly state that such "attitudinal barriers" may reflect a perception of disability based on "myth, fear or stereotype" and that this is a scenario the ADA is designed to guard against.  The Court finds that Lizotte has presented sufficient evidence at this stage to show that there are genuine issues of material fact as to whether Dacotah Bank officials regarded Lizotte as being disabled or impaired under the ADA.  When the evidence is viewed in a light most favorable to Lizotte, as is required at this stage, it is clear that a jury should be allowed to address these factual issues and examine the rationale for the termination.

## 2.     QUALIFIED TO PERFORM ESSENTIAL FUNCTIONS OF THE JOB

A "qualified individual" is defined under the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In this case the Defendants essentially determined that Lizotte was not suitable for continued employment as a loan officer.  See Docket No. 19, p. 5.

Dr. Anwar sent the Defendants a "Certification of Health Care Provider" which stated that "Mr. Lizotte can return to full work duties on 12-11-06." See Docket No. 1-1. Several of the Defendants conceded in their depositions that Lizotte could perform the day-to-day functions of his job at Dacotah Bank. Bobby Compton answered in the affirmative after being asked in his deposition, "And absent other reasons for his termination, i.e., his inappropriate conduct, [Lizotte] would still be expected to be working [at Dacotah Bank] in the future." See Docket No. 16-8, p. 154. Melgaard testified that Lizotte's performance "was acceptable up until '06" and that the 2006 evaluation "really wasn't a bad evaluation." See Docket No. 16-10, pp. 13 and 46. Melgaard went on to state,

> Q. Okay. So, fair statement, you felt he could come back and go to work and continue working even after this incident.
>
> A. As far as doing the day-to-day work. Whether or not he would get the business due to the nature of his business, which is selling himself to the commercial borrowers and having confidence that he would protect their interests in all their affairs, based on what the public may know about him or doesn't know about him, so again, it was very subjective. Hopefully that it wouldn't be an effect, but it could be an effect.

See Docket No. 16-10, p. 62. Joe Senger also answered in the affirmative when asked if Lizotte had the ability to perform his job. See Docket No. 16-11, p. 44. Dick Westra, the president and CEO of Dacotah Banks, Inc. and Dacotah Bank, testified that Lizotte's performance appraisals were not a factor in the decision to terminate him. See Docket No. 16-9, p. 20.

This second element of a prima facie case may not be a contested issue at trial as there seems to be little question that Lizotte was qualified to perform the essential functions of his job as a loan officer. Nonetheless, the Court finds there are genuine issues of material fact as to whether Lizotte

is qualified to perform the essential functions of his job with or without accommodation under the ADA.

### 3.   ADVERSE EMPLOYMENT ACTION BECAUSE OF DISABILITY

To survive summary judgment on the third element, a plaintiff must show a "specific link" between the disability discrimination alleged and the adverse employment action suffered. Simpson, 425 F.3d at 542-43 (citing Griffith v. City of Des Moines, Iowa, 387 F.3d 733, 736 (8th Cir. 2004)). "In the absence of direct evidence, the plaintiff may survive summary judgment with evidence that the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" Simpson, 425 F.3d at 542-43 (quoting Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 657 (8th Cir. 2001)).

Lizotte contends that he was terminated from his employment at Dacotah Bank because he was "regarded as" being disabled. As previously noted, the record reveals direct and circumstantial evidence that the Defendants may have terminated Lizotte because they regarded his mental condition as substantially limiting him from working at the bank. Lizotte was terminated immediately after his suicide attempt and hospitalization. The Defendants have all acknowledged that Lizotte would still be working absent the November 30, 2006 incident. See Docket Nos. 16-8, p. 154; 16-10, pp. 13, 46, and 62; and 16-11, p. 44. The Court finds that Lizotte has presented sufficient evidence, particularly when viewed in a light most favorable to him, to create a genuine issue of material fact concerning the claim the Defendants regarded him as a person with a mental impairment or disability within the meaning of the ADA. There is at least an inference of unlawful

discrimination that can be made from the facts presented.  As such, summary judgment is not appropriate on this issue.

### B.   THE McDONNELL DOUGLAS ANALYSIS – LEGITIMATE, NONDISCRIMINATORY REASON FOR TERMINATION

Once the employee establishes a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action.  Henderson, 403 F.3d at 1034.  The Defendants contend that Lizotte was terminated for three primary reasons: (1) the bank was concerned for the safety of its employees and customers; (2) the bank was concerned about its reputation in the community; and (3) the bank was concerned about its reputation with respect to its employees following policy.  There seems to be little dispute that the decision to terminate Lizotte was made by bank executives in Aberdeen "to protect the bank's image."  See Docket No. 16-10, p. 44.  Melgaard testified that Lizotte's November 2006 evaluation was also a reason, but noted that "it really wasn't a bad evaluation."  See Docket No. 16-10, p. 46.

As noted, one reason given for Lizotte's termination was concern for the safety of Dacotah Bank employees and customers.  Melgaard testified that one employee, Lisa Jundt, expressed such concern.  See Docket No. 16-10, p. 34.  However, when asked in her deposition, "Did you indicate to [Melgaard] that you did not want to work with [Lizotte] in the future?", Jundt responded, "No, I did not say that."  See Docket No. 18-1, p. 24.  Jundt also answered in the negative when asked if she expressed concerns about her safety in the future.  See Docket No. 18-1, p. 24.  Melgaard

testified that he was initially concerned for his own safety, but that concern was minimized after receiving the "Certification of Health Care Provider."  <u>See</u> Docket No. 16-10, p. 29.[1]

Another stated reason for Lizotte's termination was Dacotah Bank's concern about its reputation in the community.  The record at this stage reveals that there was no financial impact on Dacotah Bank after the November 30, 2006 incident, and apparently no one from the community indicated they would take their business elsewhere if Lizotte remained at the bank.  Compton testified he was unaware of any customer that no longer trusted Lizotte.  <u>See</u> Docket No. 16-8, p. 90.  Melgaard said several of Lizotte's customers came in to see him on business matters after he had been terminated.  <u>See</u> Docket No. 16-10, p. 65.  The few members of the community that had knowledge of the suicide incident never informed the bank they would no longer do business with the bank if Lizotte remained employed there.

The Defendants argue they were also concerned with Dacotah Bank's relationship with other employees.  The record indicates that besides upper management, the only employees who knew of the incident were Lisa Jundt and Jeff Dosch, a custodian who is no longer employed at the bank.  <u>See</u> Docket No. 16-10, p. 23.

---

[1]The Court would note that one of the narrow exceptions to the ADA's anti-discrimination provisions is for employees who pose a "direct threat to the health or safety of other individuals in the workplace."  <u>Den Hartog v. Wasatch Acad.</u>, 129 F.3d 1076, 1087 (10th Cir. 1997); 42 U.S.C. §§ 12113(a) and (b).  A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3).  The determination that an individual is unqualified because he poses a direct threat must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job," which in turn must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."  29 C.F.R. § 1630.2(r).  The "direct threat" defense is an affirmative defense which was not asserted in this case.

The Court finds that there are genuine issues of material fact as to whether the Defendants had legitimate, non-discriminatory reasons for Lizotte's termination. When all of the evidence is viewed in a light most favorable to Lizotte, which is required at this stage of the litigation, summary judgment is not appropriate. There may have been legitimate, non-discriminatory reason(s) to terminate Lizotte in December 2006, but there are certainly inferences that can be drawn from the evidence presented that the bank acted on the basis of myth, fear, or stereotype, and that Lizotte's perceived mental impairment was the reason for the termination. The record clearly presents a question of fact on this issue.

### C.   THE McDONNELL DOUGLAS ANALYSIS – PROFFERED REASON IS A PRETEXT FOR DISCRIMINATION

If the employer (Dacotah Bank) provides a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff (Lizotte) to show that the proffered reason is a pretext for discrimination. Henderson, 403 F.3d at 1034. "To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.'" Id. (quoting Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004)). A plaintiff may prove pretext by showing that the employer's stated reason for the adverse action has no basis in fact. Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006). The employer's motive and intent are at the heart of a discrimination case, so the central inquiry is whether disability "was a factor in the employment decision *at the moment it was made*." Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 403 (1st Cir. 1990) (emphasis in original) (internal citations omitted).

Lizotte argues that the Defendants' concerns for safety, reputation in the community, and rapport with bank employees were unfounded and based on "myth, fear or stereotype." As noted, Dr. Anwar testified that he would not have released Lizotte if he felt Lizotte was a danger to himself or others. See Docket No. 16-7, p. 52. No one from Dacotah Bank tried to contact Dr. Anwar to determine if Lizotte posed a threat or danger to himself or others. The Defendants have not produced any evidence that Dacotah Bank was at risk of losing customers, beyond mere speculation. Few Dacotah Bank employees knew of the incident. Even if the Defendants are able to present a legitimate, non-discriminatory reason for Lizotte's termination, there remain genuine issues of material fact as to whether the proffered reasons were merely a pretext for discrimination. As previously noted, courts have recognized that an employer's motive or intent is rarely susceptible to resolution at the summary judgment stage.

Whether Lizotte will ultimately succeed in proving that prohibited discrimination occurred is a different question. The hurdle of proving pretext is often a difficult task in ADA cases. However, the record clearly reveals there are questions of fact related to this issue which are appropriate for a jury to resolve rather than this court. When all of the evidence is viewed in a light most favorable to Lizotte, summary judgment is not appropriate.

### D.      ADMISSIBILITY OF EEOC DOCUMENTS

The Defendants contend that the Court should exclude the Equal Employment Opportunity Commission (EEOC) documents from trial, including the Department of Labor's determination letter and the parties' position statement to the EEOC. Lizotte contends that it is premature to rule on the admissibility of the Labor Department's determination. The Court in its discretion finds that the

North Dakota Department of Labor's/EEOC's determination, investigative findings and analysis, and conclusion as set forth in a letter dated January 3, 2008, will not be admissible at trial.  See <u>Doss v. Frontenac</u>, 14 F.3d 1313, 1318 (8th Cir. 1994).  The Court will reserve ruling on the admissibility of the parties' position statements to the EEOC.


IV.    <u>CONCLUSION</u>

The Court finds, after viewing the evidence in a light most favorable to Lizotte, that there are a number of disputed factual issues that warrant a jury trial and preclude the granting of partial summary judgment on the ADA claim.  There are genuine issues of material fact in dispute as to whether Lizotte was terminated from his employment on December 14, 2006 because he was "regarded as" suffering from a mental impairment or disability that substantially limited his ability to engage in a major life activity, namely working.  There are genuine issues of material fact concerning the basic elements of a prima facie case under the ADA which make it inappropriate to grant partial summary judgment at this stage.[2]

The ADA does not require that Dacotah Bank officials put its staff and the general public at risk by employing an individual who poses a direct threat to others.  But the ADA does require the bank to provide due consideration to an individual they arguably may have "regarded as" having a mental impairment and who may be able, with reasonable accommodation, to perform his work productively and safely.  There is conflicting evidence as to whether the employment decisions were made because of a perception of a disability.  The evidence in this case is not so one-sided that one

---

[2]There are eight different state law claims asserted in the complaint, several of which are of dubious merit.  The Court respectfully requests that the parties carefully review the merits of the state law claims and take immediate steps to narrow the issue(s) in this case for trial.

party must prevail as a matter of law.  There has been direct and circumstantial evidence presented, and certainly reasonable inferences that can be drawn from such evidence, that create genuine issues of material fact.  The Eighth Circuit has made it very clear that motions for summary judgment in employment discrimination cases are to be scrutinized carefully, and that summary judgment in such cases is disfavored and should seldom be used.  The Court is convinced that there are genuine factual disputes in this case for a jury to resolve.  The Court **DENIES** the Defendants' motion for partial summary judgment (Docket No. 12).

**IT IS SO ORDERED.**

Dated this 7th day of January, 2010.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

25